# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40322-EDK |
| JOSEPH S. CAMPISI, JR., | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| ADVANTAGE CAPITAL FUNDING LLC, | ) | Adversary Proceeding |
| WESTWOOD CAPITAL FUNDING LLC, | ) | No. 23-4020 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH S. CAMPISI, JR., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OF DECISION

Before the Court after trial is a complaint filed by Advantage Platform Services, Inc.

("Advantage") and Westwood Capital Funding, LLC ("Westwood") (together, the "Plaintiffs")

against Joseph S. Campisi, Jr., the debtor in the underlying Chapter 7 bankruptcy case (the

"Debtor"). The following constitute the Court's findings of fact and conclusions of law pursuant

Federal Rule of Civil Procedure 52(a)(1), made applicable by Federal Rule of Bankruptcy

Procedure 7052. The factual findings contained in this Memorandum are based on trial testimony,

the admitted evidence, and the Court's own records. *See LeBlanc v. Salem (In re Mailman Steam*

*Carpet Cleaning Corp.),* 196 F.3d 1, 8 (1st Cir. 1999).

The relationship between the Plaintiffs and the Debtor originated in late 2020 when the

1

Debtor, as the owner of Campisi Environmental Associates, Inc. ("Campisi Environmental"), entered into merchant cash advance ("MCA") agreements with the Plaintiffs, through which the Plaintiffs purchased $1.116 million in "future receipts" of Campisi Environmental for the combined total amount of $775,000.[1]   The Debtor personally guaranteed the company's indebtedness to the Plaintiffs under the MCA agreements.  In connection with the agreements, both Advantage and Westwood filed financing statements under the Uniform Commercial Code (the "UCC-1 Statements"; the "UCC") with the Massachusetts Secretary of State, granting the Plaintiffs security interests in all of Campisi Environmental's assets.

Advantage and Westwood were far from the only lenders from whom the Debtor and Campisi Environmental had borrowed funds over the years.  From the outset, the company continually struggled to stay afloat, even as the business quickly grew.  That struggle continued into the early part of 2021.  Mere months after entering into the MCA agreements with the Plaintiffs, Campisi Environmental was desperate for additional financing and the Debtor was actively pursuing various funding options for the company.  Assisting with those efforts was Robert Tucker ("Tucker"), owner of Cromwell Asset Management LLC, who acted as a broker in aid of the Debtor's search for additional funding for the company.

By the middle of 2021, the Debtor and Tucker had identified AmeriFactors Financial Group, LLC ("AmeriFactors") as a potential source of substantial funding that would be sufficient to pay off some or all of Campisi Environmental's existing debt, including the debts owed to the Plaintiffs.  By late June 2021, the Debtor and Tucker were working to provide AmeriFactors with an application and other financial information in hopes of reaching a deal.  The Debtor testified at trial that an issue for AmeriFactors was the number of UCC liens recorded against Campisi

---

[1] While not germane to the issues currently before the Court, the Court takes no position as to whether the transactions constituted sales of future receivables or loans.

2

Environmental's assets, and the Debtor described the status of the UCC terminations as "a critical path item for the Amerifactors deal." Cont. Ex. 38.

During this time, Tucker engaged in correspondence with a company named CT Corporation ("CT"), which appears to be in the business of filing UCC statements and terminations. Tucker and a CT representative, Erin Roberson, exchanged emails regarding the preparation and filing of UCC terminations. Roberson instructed Tucker on how to complete the terminations, and Tucker passed those instructions along to the Debtor with a blank form UCC termination. The Debtor completed 18 UCC terminations for the company's lienholders, including terminations of the Plaintiffs' UCC Statements (the "UCC Terminations"), and returned them to Tucker. In turn, Tucker provided the terminations to CT, sent follow-up inquiries to CT to make sure they would be filed (which they were, on July 9, 2021), and received confirmation of their filing on July 14, 2021.

At no time did the Plaintiffs authorize the Debtor, Campisi Environmental, Tucker, CT, or any other party to file the UCC Terminations, and there is no dispute that (as a Massachusetts state court later determined) the filing of those terminations was fraudulent. Ultimately, after learning of the unauthorized terminations, AmeriFactors declined to provide Campisi Environmental with any funding.

At trial, both the Debtor and Tucker expressed ignorance as to how or why the UCC Terminations had been filed without authorization and without payment of the underling debts. The Debtor's testimony in this regard was credible; Tucker's testimony less so. Tucker, for his part, repeatedly insisted that, despite his communications with CT regarding the terminations, he had no intention of having the UCC Terminations filed without authorization. Instead, Tucker said that he was merely assisting the Debtor in providing information to AmeriFactors to clarify

the identity and related debt amounts for the company's existing lienholders so that AmeriFactors could negotiate with those lenders in reaching agreements regarding the amounts to be paid.

The Debtor, for his part, credibly testified that, when asked to complete the terminations, he reached out to Tucker to inquire as to why the forms needed to be completed. According to the Debtor, Tucker informed him that the UCC Terminations needed to be in place to make sure that the liens were terminated once funds were distributed to the existing lienholders. The Debtor further credibly testified that, while he considered being asked to complete the terminations to be somewhat unusual, he had been asked to do the same in connection with earlier financing from another company. As earlier noted, the Debtor did not personally file the UCC Terminations, and nowhere in the submitted documents is there evidence that the Debtor instructed anyone else to file the terminations without authorization. And, while it is undisputed that the Debtor has substantial business and financial experience and is aware of nature and function of UCC-1 statements in general, the Debtor himself was not involved with the discussions regarding the terminations with CT. Further, the Debtor was credible in his insistence that he did not complete the UCC Terminations with the intent of personally filing them or having them filed at his direction.

In a declaratory judgment action brought by the Plaintiffs against Campisi Environmental in the Massachusetts Superior Court, the court found and ruled, in connection with the entry of default judgment, that the UCC Terminations were "filed fraudulently, and without the authorization of the secured parties." Ex. 44. The Superior Court, after reviewing the complaint, affidavit, exhibits, and excerpt from the Debtor's deposition submitted by the Plaintiffs, specifically noted that "Robert Tucker of Cromwell Asset Management orchestrated the filing of the unauthorized [UCC Terminations], acting as an agent on behalf of [Campisi Environmental]

4

and its President Joseph Campisi." *Id.* However, the Court did not make any determination that the *Debtor* "orchestrated" or directed the filing of the UCC Terminations or was aware that they would be filed without authorization, noting only that the Debtor "filled out" the terminations. *Id.* Based on the Debtor's credible testimony at trial, the Court credits the Debtor's assertion that the Debtor was not personally responsible for the unauthorized filing of the UCC Terminations and did not complete the UCC Terminations with the knowledge or intent that those terminations would be filed without authorization.

Unfortunately for the Plaintiffs, the unauthorized filing of the UCC Terminations was not without consequence. Campisi Environmental eventually defaulted on its agreements with the Plaintiffs, and the Plaintiffs each obtained judgments against the Debtor and Campisi. Collecting on those judgments and realizing on their security interests under the UCC-1 Statements was greatly complicated by the unauthorized filing of the UCC Terminations. The Plaintiffs incurred thousands of dollars in legal fees and expenses to secure the declaration from the Massachusetts state court that the UCC Terminations were fraudulently filed and to defend themselves in an interpleader action filed by one of Campisi Environmental's account debtors in the state of Washington.

While the Debtor (and Tucker) continued to work over the ensuing year or so to obtain adequate funding to keep the company afloat, Campisi Environmental proved to be an unsustainable enterprise. On October 16, 2022, Campisi Environmental filed a voluntary petition under Chapter 7 of United States Bankruptcy Code (the "Bankruptcy Code" or the "Code").[2] Several months later, the Debtor followed suit, filing his own individual Chapter 7 petition on April 27, 2023.

---

[2] *See* 11 U.S.C. §§ 101 *et seq.* All statutory references are to provisions of the Bankruptcy Code unless otherwise stated.

On June 2, 2023, the Plaintiffs commenced this adversary proceeding by filing a five-count complaint against the Debtor.  Counts I, II, and III seek rulings that "the debts" owed to the Plaintiffs by the Debtor should be excepted from the Debtor's bankruptcy discharge under §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), respectively.  Counts IV and V seek denial of the Debtor's discharge in its entirety pursuant to §§ 727(a)(3) and 727(a)(4)(A), respectively.

At trial, the Plaintiffs failed to introduce evidence or elicit testimony regarding the claims brought under §§ 523(a)(4),[3] 727(a)(3),[4] and 727(a)(4)(A)[5] — Counts II, IV, and V, respectively. Nor did the Plaintiffs include any arguments regarding those counts in their post-trial brief. Accordingly, those claims are deemed waived. *See Casanova v. Wyndham Grand Rio Mar Beach Resort & Spa*, 205 F. Supp. 3d 220, 237 (D.P.R. 2016) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 16 (1st Cir. 2013) (internal citation omitted)).

Additionally, the claims in the complaint asserting that the underlying obligations under the MCA agreements with the Plaintiffs (and the Debtor's guarantee of those obligations) should be excepted from discharge are either unavailing or no longer being pursued.  At trial, the parties represented to the Court that the parties had stipulated "that there was no fraud inducement of the

---

[3] Section 523(a)(4) excepts from a debtor's discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).

[4] Section 727(a)(3) provides that a debtor's discharge may be denied if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).

[5] Section 727(a)(4)(A) provides that a debtor's discharge may be denied if "the debtor knowingly or fraudulently, in or in connection with the case — made a false oath or account."  11 U.S.C. § 727(a)(4)(A).

loan underlying case." Trial Tr. 118:12-3.  While far from a model of clarity, the Court interprets this representation as a concession that there is no evidence of the Debtor's wrongdoing or malfeasance that would warrant a ruling that the obligations under the initial MCA agreements should be excepted from discharge.  And, in fact, the Plaintiffs' brief narrowed the request for a finding of nondischargeability to only "the costs incurred as a consequence" of the Debtor's allegedly "fraudulent conduct."  Pls.' Trial Br. 1, Dkt. No. 52.

Accordingly, the matters left for determination are the claims under Counts I and III that the costs incurred by the Plaintiffs on account of the unauthorized filing of the UCC Terminations (which, for ease of reference, will be referred to as the "termination costs") should be excepted from the Debtor's discharge pursuant to §§ 523(a)(2)(A) and/or 523(a)(6).

At the outset, the Court notes that nothing in the record indicates that the Debtor has been adjudicated to be personally liable for the Plaintiffs' termination costs.  Nor did the Plaintiffs ask this Court to determine any such liability.  However, even if the Plaintiffs were theoretically able to secure a judgment (or judgments) against the Debtor for the termination costs in another court of competent jurisdiction, the Court determines that any such liability is *not* excepted from the Debtor's discharge for the reasons set forth herein.

Count I asserts that liability for the terminations costs should be excepted from the Debtor's discharge pursuant to § 523(a)(2)(A) as a debt incurred as a result of the Debtor's "actual fraud" in conspiring with Tucker to file the UCC Terminations without authorization.  However, § 523(a)(2)(A) does not except from a debtor's discharge *every* debtor arising or liability incurred as the result of a debtor's fraud.  Rather, it excepts only debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by" the fraud.  11 U.S.C. § 523(a)(2).  As the Fourth Circuit Court of Appeals has explained:

> The plain language of [§ 523(a)(2)(A)] requires the debtor to have obtained money, property, services, or credit through her fraud or use of false pretenses. It is clear from the structure of the phrase that "to the extent obtained" modifies the money, property, services, or credit that constitute the debt. A plain reading of this subsection demonstrates that Congress excepted from discharge not simply any debt incurred as a result of fraud but only debts in which the debtor used fraudulent means to obtain money, property, services, or credit.

*Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219 (4th Cir. 2007) (quoting 11 U.S.C. § 523(a)(2)(A)) (holding that debtor's liability for fraud while acting as a private investigator was not excepted from discharge under § 523(a)(2)(A), because the debtor did not obtain money, property, services, or credit as a result of the fraud). *See also Oasis, Inc. v. Fiorillo (In re Fiorillo)*, No. 10-44179-MSH, 2015 WL 1859052, at *1-3 (Bankr. D. Mass. Apr. 21, 2015) (sanction against debtor as a result of submitting false testimony and forged document in prepetition litigation was not excepted from discharge under § 523(a)(2)(A), since the debtor did not obtain money, property, services, or credit from the plaintiff on account of the debtor's fraud), *aff'd sub nom. Oasis, Inc. v. Fiorillo*, 246 F. Supp. 3d 489 (D. Mass. 2017).

Here, as in the *Rountree* and *Fiorillo* cases, even if the Debtor acted fraudulently with regard to the UCC Terminations (and assuming the Debtor would be liable for the termination costs), the Debtor did not obtain money, property, services, or credit from the Plaintiffs on account of that fraud. Accordingly, § 523(a)(2)(A) does not apply and judgment must enter in favor of the Debtor on Count I.

The Code does not leave creditors without recourse, however, in cases where a debtor has caused injury to a creditor through fraudulent action under circumstances that do not fit within the purview of § 523(a)(2)(A). "[T]he Fourth Circuit's [*Rountree*] decision . . . announces loudly and clearly that in a case where a debtor committed fraud but did not acquire money or property as a result, the proper cause of action under Bankruptcy Code § 523 is not under subsection (a)(2)(A)

8

but (a)(6)." *Fiorillo,* 2015 WL 1859052, at *5 (citing *Rountree,* 478 F.3d at 222).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A fraudulent or wrongful act that leads to the release of another's lien, causing economic injury to a party and harming the party's rights in collateral, may constitute a willful and malicious injury within the meaning of that provision. *See, e.g., Lampi v. Hundman Lumber Mart Co., Inc. (In re Lampi),* 152 B.R. 543, 545 (C.D. Ill. 1993) (affirming bankruptcy court's ruling that debt was excepted from discharge under § 523(a)(6) where debtors acted willfully and maliciously when they tendered a lien waiver on creditor's behalf knowing that the debt would not be paid and creditor would lose its lien priority).

In order for a debt to be excepted from discharge under § 523(a)(6), the action causing the injury and giving rise to the debt must have been committed by the debtor. The plain language of § 523(a)(6) references debts arising from "injury *by the debtor,*" and does not, therefore, include a debtor's potential liability for another party's willful and malicious conduct. 11 U.S.C. § 523(a)(6) (emphasis added). In addition, the action must have been willful and it must have been malicious. "[A] debtor who intentionally acts in a manner he knows, or is substantially certain, will harm another may be considered to have intended the harm and, therefore, to have acted willfully within the meaning of § 523(a)(6)." *O'Rorke v. Porcaro (In re Porcaro),* 545 B.R. 384, 396 (B.A.P. 1st Cir. 2016) (quoting *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 19 (Bankr. D. Me. 1998)). And the "element of 'malice' . . . requires the creditor to show that the injury was caused 'without just cause or excuse.'" *B.B. v. Bradley (In re Bradley),* 466 B.R. 582, 587 (B.A.P. 1st Cir. 2012) (quoting *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir.1997)).

Based on the Court's factual findings, the Court cannot conclude that the Debtor, in merely

9

completing the UCC Terminations (however ill-advised that may have been) caused or acted with the requisite intent to cause the injury suffered by the Plaintiffs. The Debtor did not directly cause the injury (the loss of the Plaintiffs' secured position and the terminations costs), because it was not the Debtor who filed the terminations or directed their filing. The Debtor also did not intentionally act in a manner that he knew, or was substantially certain, would cause the harm, or act without just cause or excuse, since the Debtor credibly believed that the UCC Terminations would not be filed unless and until the Plaintiffs' secured claims were paid. Accordingly, any liability of the Debtor with regard to the termination costs will not be excepted from discharge under § 523(a)(6).

For all the foregoing reasons, judgment on each of the counts of the complaint will enter in favor of the Debtor. A separate judgment in conformity with this Memorandum will issue forthwith.

DATED: May 29, 2026                    By the Court,

_____

Elizabeth D. Katz
United States Bankruptcy Judge

10